### People ex rel. Jessie Spalding Walker v. Aurora, Elgin & Chicago Railway Company.

### Gen. No. 13,811.

1. FRANCHISES—*ordinances as to stopping of trains construed.* *Held,* that the several ordinances in question in this case, construed together, did not impose upon the respondent company any obligation to make regular stops at the points named in the petition for *mandamus.*

2. MANDAMUS—*who cannot maintain, to obtain construction of franchise ordinance.* A private citizen without legal, property or personal interest cannot maintain *mandamus* to settle some doubtful question arising upon the face of a franchise ordinance. People v. Suburban R. R. Co., 178 Ill. 508, explained.

Mandamus. Error to the Circuit Court of Cook county; the Hon. RICHARD S. TUTHILL, Judge, presiding. Heard in this court at the October term, 1907. Affirmed. Opinion filed April 30, 1908.

TAYLOR & MARTIN, for plaintiff in error.

HOPKINS, PEFFERS & HOPKINS, for defendant in error.

MR. JUSTICE BROWN delivered the opinion of the court.

Jessie Spalding Walker of Chicago filed a petition in the Circuit Court of Cook county on May 24, 1906, praying for a writ of *mandamus* directed to the Aurora, Elgin and Chicago Railway Company, com-

People v. Aurora, Elgin & Chicago Ry. Co.

manding it to stop all its passenger trains at Austin boulevard (the western limit of the city of Chicago) and at Central avenue (one-half mile east of Austin boulevard).

The petition avers that said Walker is a resident of Chicago, and the Aurora, Elgin and Chicago Railway, a corporation organized under the law of Illinois relating to the organization of railroad companies, that has been engaged since before February 23, 1905, in operating an electric road through parts of Kane, DuPage and Cook counties. It also avers that the Metropolitan West Side Elevated Railroad Company is a corporation organized under the same law, and that for many years before Februry 23, 1905, it had been engaged in operating an elevated railroad in the city of Chicago.

The petition sets up two ordinances of the city of Chicago in full. We note them in chronological order, which is reversed in the petition.

The first is an ordinance passed by the city council of Chicago March 18, 1901. The ordinance licenses the construction and operation of a railroad by the Metropolitan West Side Elevated Railway Company, its successors, assigns or lessees, "commencing at the present western boundary line of the city of Chicago in Austin boulevard (Sixtieth avenue) and running thence easterly between the south line of Harrison street on the north and the center line of the right of way of the Chicago Terminal Transfer Railroad Company on the south, etc., * * * to the east line of South Fifty-second avenue in said city, with the right to connect the tracks authorized with its railroad tracks theretofore authorized by ordinance to be laid."

Section 6 of this ordinance provides that "The said railway company, its successors, assigns or lessees, shall construct, and at all times during the continuation of this ordinance shall maintain, stations for the accommodation of passengers at Central avenue and

at Austin boulevard, at which all trains shall stop to take on or let off passengers.''

This ordinance, the petition avers, was duly accepted by the Metropolitan West Side Elevated Railway Company.

The second ordinance was passed by the city council of Chicago on February 23, 1905. This ordinance provides in its first section that:

''In consideration of the acceptance hereof and the undertaking by the Metropolitan West Side Elevated Railway Company, its successors, assigns and lessees, to comply with the provisions, conditions and requirements herein contained, permission and authority are hereby granted and given to said Company, its successors and assigns, by contract with the Aurora, Elgin and Chicago Railway Company, to permit such Company to operate its cars or trains for transportation of passengers, mails and newspapers over the lines of road of said Metropolitan West Side Elevated Railway Company, its successors and assigns, *Provided, however, that such cars and trains while on the road of the said Metropolitan Company shall not perform a local service* and shall be under the control and management of said Company.''

The second section provides that:

''The permission and authority hereby granted to said Metropolitan West Side Elevated Railway Company, its successors, assigns and lessees, are upon the express condition that said Metropolitan Company shall daily operate a sufficient number of cars to meet the demands of public traffic between 52nd Avenue and Austin Boulevard at an interval of every fifteen minutes during the period from 6 A. M. to 8 P. M.,'' etc.

The third section makes a condition in similar terms, that within two years the said Metropolitan Company will maintain a service with not more than fifteen minutes between trains between its Fifth Avenue terminal and the city limits (*i. e.,* Austin boulevard or North Sixtieth avenue), ''it being the intention of this provision to eliminate the change of cars by pas-

sengers now required and in effect at the Fifty-second avenue station of the said Metropolitan Company.''

Section 4 contains the provision that:

''The permission and authority hereby granted to said Metropolitan West Side Elevated Railway Company, its successors, assigns and lessees, are upon the express condition that said Company, its successors, assigns and lessees, shall be bound by all of the terms, conditions and provisions of an ordinance of March 18, 1901, duly accepted by said Metropolitan West Side Elevated Railway Company,'' etc.

The petition avers that the Metropolitan West Side Elevated Railway Company accepted this ordinance, and shortly thereafter the Aurora, Elgin and Chicago Railway Company, by contract with said Metropolitan West Side Elevated Railway Company, availed itself of the privileges and licenses granted in said ordinance, and has ever since and is now operating its trains for the transportation of passengers over the lines of road of said Metropolitan West Side Elevated Railway Company from Austin boulevard to the Fifth avenue terminal on the line of said road of said Metropolitan West Side Elevated Railway.

The petition then avers that the Aurora, Elgin and Chicago Railway Company is not now complying and has never complied with section 6 *of the ordinance of March 18, 1901,* which requires all passenger cars to stop at Central avenue and Austin boulevard to take on and let off passengers; that the said Aurora, Elgin and Chicago Railway Company, the respondent, stops passenger trains at Austin boulevard coming east to the Fifth avenue terminal to let off passengers only, but refuses to permit passengers to get on its trains at Austin boulevard coming east, and that no trains of respondent stop at Central avenue, either west-bound or east-bound, to take on or let off passengers; that west-bound trains stop at Austin boulevard to take on passengers for transportation west of Austin boulevard, but will not discharge passengers at said Austin boulevard.

Further averments are that the Metropolitan West Side Elevated Railway Company has established and now maintains stations at both Austin boulevard and Central avenue; that Austin boulevard, where it intersects the line of road of the Metropolitan West Side Elevated Railway Company, is immediately adjacent to the western limits of the city of Chicago, and that the said station at Central avenue is one-half mile east of the station at Austin boulevard; that the distance between the Fifth avenue terminal of the Metropolitan West Side Elevated Railway Company and the station at Austin boulevard is approximately seven miles; that the said Metropolitan Railway Company maintains stations between these two points at eighteen different streets, which are named; that at the time of the enactment of the ordinance of February 23, 1905, and continuously since, the said Metropolitan West Side Elevated Railway Company was engaged in operating an elevated railroad and maintained passenger stations at these different streets, including Central avenue, and at Austin avenue.

It is in virtue of the premises that the writ of *mandamus* is asked.

To this petition a general and special demurrer was filed, the special grounds of demurrer set forth being: First, that petitioner does not show that she is entitled to maintain the petition, and, second, that the Metropolitan West Side Elevated Railway Company is an indispensable party to the petition.

June 29, 1907, the Circuit Court on argument sustained the demurrer, and as the petitioner elected to stand by her petition, dismissed the same at the costs of the petitioner, to reverse which judgment order the petitioner has sued out this writ of error.

There is, in our opinion, more than one reason why the judgment of the court below in this case is right and should be affirmed.

In the first place, by the ordinances which are set forth in the petition there is no duty imposed on the

respondent, the Aurora, Elgin and Chicago Railway Company, to stop its trains at the stations at Central avenue and Austin avenue, or at either of them.

It is true that the ordinance of March 18, 1901, provides (among many other stipulations) that the Metropolitan West Side Elevated Railway Company and its successors, assigns or *lessees* shall stop all their trains at Central avenue and at Austin boulevard, and that the ordinance of February 23, 1905, allowing the Metropolitan West Side Railway Company to contract with the Aurora, Elgin and Chicago Railway Company to permit that company to operate its trains over the lines of the Metropolitan Company, purports to give that permission "on the condition that said Metropolitan Company, its successors, assigns and *lessees* shall be bound by all of the terms, conditions and provisions" of the ordinance of March 18, 1901.

But it is also true that in this later ordinance there are other provisions prior to the one before quoted, explicitly making the permission for a contract between the two railways conditional that the Aurora Company shall not perform any local service, and that the Metropolitan Company shall maintain and operate a sufficient number of cars to meet the demands of public traffic at the two points involved here.

It does not require much astuteness indeed to recognize the fact that in all probability the ordinance would never have been asked or accepted or the contract permitted by it made, unless this reservation by the Metropolitan Road had been provided for. The object of the ordinance to allow the Aurora inter-urban road an entrance into the city without making it a competitor of the Metropolitan intra-urban line, is apparent. Construing the two ordinances together, the absence of any obligation imposed by them on the Aurora, Elgin and Chicago Railway Company to stop its trains at Central avenue or Austin boulevard seems to us clear.

This renders any further discussion of the case unnecessary. But we agree with the learned judge of the Appellate Court of the Fourth District, in deciding a similar case—The People v. St. Louis & Belleville Electric Railway Company, 122 Ill. App. 422—that the doctrine laid down by the Supreme Court in North v. The Trustees of the University of Illinois, 137 Ill. 296, is entirely applicable to a case like this, namely: That *mandamus* will not lie on the petition of a private citizen merely to settle some doubtful question. "To entitle him to the writ he must clearly show that he has a legal right which he has been denied, and that the denial of such right affects his personal interest."

We have noted the argument of the plaintiff in error that the case is inapplicable as authority, because of a different state of facts. The reasoning, however, is satisfactory to us. We are not citing the case as authority, but as noting our own agreement with its reasoning.

"It is only as a passenger seeking transportation from Belleville to East St. Louis or *vice versa* that relator is personally interested," said the learned judge in the case cited of the demand of the relator in that case for the restoration of passenger service on the defendant's road, adding, "It is not clearly apparent that the relator has been injured in his personal interest or that he would in any way be benefited by the reinstatement of passenger service upon defendant's road. * * * For aught that appears in the record, there is and was at the time of filing the petition ample facilities for the carriage and accommodation for relator and all other would-be passengers, and with precisely the same kind of service now sought to be required of the defendant. * * * In what respect then, it may be asked, would be the practical benefit to the relator?" And so the writ was denied. The situation here is the same. We do

not think the allegations of the petition show any personal *interest* or consequently any standing in the relator to demand as of right this extraordinary remedy. Nor do we think that the court in the People v. The Suburban R. R. Co., 178 Ill. 594, meant to decide to the contrary of this doctrine.

A person may have no ''legal'' or property interest, and yet have a ''personal'' interest, which will warrant his application for a mandamus, undoubtedly, and the facts of the Suburban Railroad case show plainly enough that every resident of River Forest would be likely to have a personal interest in the action sought in that case.

But in any event, whether or not there was any standing shown in the relator to demand the performance of the obligation if it had existed, we are clear that there is no such obligation. We do not deem it necessary to pass on the alleged want of necessary parties defendant to the petition.

The judgment of the Circuit Court is affirmed.

*Affirmed.*